## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| TIA VAN HESTER, | ) | |
| | ) | |
| | ) | Case No. _____ |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ILLINOIS CENTRAL COLLEGE; THE | ) | |
| BOARD OF TRUSTEES OF ILLINOIS | ) | Jury Trial Demanded |
| CENTRAL COLLEGE; BRUCE BUDDE; | ) | |
| JILL WRIGHT. | ) | |
| | | |
| Defendants. | | |

## **COMPLAINT**

Plaintiff Tia Van Hester ("Van Hester"), by and through her attorney, Matt Singer Law, LLC, files this Complaint against Defendants Illinois Central College, the Board of Trustees of Illinois Central College (collectively "ICC"), Bruce Budde ("Budde") and Jill Wright ("Wright") (collectively the "Individual Defendants") and alleges as follows:

1.      Plaintiff Tia Van Hester is a talented, scrupulous, and hardworking academic administrator who devoted her passion and energy to ICC and its students for seven years. She served as ICC's Director of International Education, and in that position was responsible for enrollment and programming for dozens of international students at the college. Despite her excellent performance, as recognized in her annual performance reviews, the promises ICC made when it recruited her, and her extensive and high-level responsibilities, ICC paid her much less than similarly situated non-Black Directors at the college.

1

2.      Van Hester respectfully but forcefully challenged the obvious race-based disparity in her pay as compared to ICC's other, non-Black Directors. She specifically and repeatedly emphasized to her supervisor Jill Wright and other ICC administrators that ICC was underpaying her because of her race. But ICC's administrators refused to take action to correct the egregious pay disparity.

3.      Van Hester was outspoken on other important issues as well. During the spring and summer of 2021, ICC reopened with minimal and insufficient protections against COVID-19. On behalf of ICC's students and staff, Van Hester pushed back on ICC's cavalier and irresponsible reopening plan.

4.      ICC, Van Hester's supervisor Wright, and ICC's Executive Vice President for Administration and Finance Bruce Budde decided that they could not tolerate having a Black woman who challenged ICC's discriminatory pay practices and COVID policies remain employed at the college—no matter how good she was at her job. They concocted a plan to fire her on transparently flimsy and pretextual grounds. They carefully timed the plan to ensure that they could receive the maximum benefit from Van Hester's high-quality and underpaid labor, waiting to fire her until immediately after she finished processing registration for ICC's large incoming class of international students on F-1 visas.

5.      Van Hester brings this action to hold Defendants accountable for their flagrant pay discrimination and their racially discriminatory and retaliatory termination of her employment.

## PARTIES, JURISDICTION AND VENUE

6.      Plaintiff's federal claims arise under 42 U.S.C. § 1983 and Title VII of the Civil Rights Act of 1964.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in the Central District of Illinois pursuant to 28 U.S.C. § 1391 as a substantial part of the events or omissions giving rise to this case occurred in this district.

## FACTUAL ALLEGATIONS

8.      Plaintiff Tia Van Hester began working for ICC in 2014, when she became ICC's International Education Coordinator. She served in that role until 2018, when she left for a Director-level role at another college. In addition to serving as International Education Coordinator, Van Hester also taught several English and International Education classes as an adjunct professor. Even after she took a full-time role at another college, Van Hester continued to serve as an adjunct professor at ICC.

9.      During her first stint at ICC, Van Hester performed all her duties successfully and was never disciplined.

10.      In 2019, ICC and Wright attempted to recruit Van Hester back to ICC. Among other promises, Wright assured Van Hester that, if she returned to ICC, she would receive a Director-level title and commensurate pay. Based in part on these promises, Van Hester decided to return to ICC as a full-time employee.

3

11.     In July 2019, ICC hired Van Hester as its "Director of International Education." In this position, Van Hester was responsible for leading all aspects of ICC's international education programming. Among many other things, Van Hester led ICC's international student recruitment efforts; managed visa, immigration, and homeland security issues relating to ICC's international student population; oversaw international student enrollment, orientation, and retention; and counseled ICC's substantial population of international students. In addition, Van Hester was responsible for designing and leading ICC's study abroad programs.

12.     Throughout her tenure as ICC's Director of International Education, Van Hester devoted considerable time and energy—both during and outside of business hours—to serving ICC and its international student population. She was good at her job, which ICC recognized. Her official performance reviews were strong and recognized her talent, her efforts, and her contributions to ICC's community. Van Hester received special recognition both within and outside of ICC because of her outstanding work. In particular, she was awarded a valuable fellowship from the NAFSA Academy for International Education. Her colleagues at ICC awarded her ICC's top diversity award in May 2021 for her outstanding contributions to the institution's diversity efforts.

13.     Recognizing that Van Hester was an exceptional Director, and eager to benefit from her unique talent, ICC continued to add to her responsibilities throughout her tenure. Under Van Hester's leadership, ICC's international program expanded considerably. In particular, and among other things, the number of students attending ICC on F-1 visas doubled while Van Hester served as Director of

4

International Education. This substantially increased Van Hester's workload. ICC did nothing to assist her with the increased workload; she received no additional pay or administrative support. Van Hester simply worked harder and more to manage the expanded international student population.

14.    In recent years, including around the time that it rehired Van Hester, ICC has been the subject of several controversies and lawsuits regarding its mistreatment of its Black employees. Accordingly, ICC was eager to present itself to the public, its students, and its faculty and staff as a racially progressive organization, where it was possible for Black employees to advance and obtain high level positions. On its website, ICC listed Van Hester as a Director, alongside its other Directors.

15.    Despite giving Van Hester the job title of Director, and presenting Van Hester to the public as a Director, ICC refused to pay Van Hester as a Director.

16.    ICC classifies its jobs based on "pay grade." For each "pay grade," a minimum, median, and maximum salary is assigned. Higher pay grades have higher minimum, median, and maximum salaries than lower pay grades.

17.    ICC assigned Van Hester a pay grade of 22. The other non-Black Directors were classified as pay grade 26 or higher. The median salary for pay grade 22 was nearly $10,000 less per year than the median salary for pay grade 26. In addition, within her pay grade of 22, Van Hester's salary was significantly below the median.

18.    ICC paid Van Hester less than every other full-time Director at ICC. ICC paid Van Hester less than similarly situated non-Black Directors.

5

19.     Van Hester repeatedly raised concerns to ICC officials about being paid less than other Directors at the College. She spoke to her supervisor, Wright, about the pay discrepancies on numerous occasions. When she filled out self-assessments on her performance reviews, Van Hester emphasized that her salary was unfairly low compared to her peers. She twice filed official pay reclassification requests with the college, both of which were denied out of hand.

20.     When she complained about her unjustifiably low pay as compared to her Director peers, Van Hester specifically and repeatedly emphasized that the pay discrepancy was racially discriminatory. She asserted that she was paid less than her non-Black Director counterparts because of her race. ICC never acknowledged these serious concerns, let alone investigated them. Instead, ICC simply refused to consider increasing Van Hester's pay to a level commensurate with her non-Black counterparts.

21.     In 2020, as a result of the COVID-19 pandemic, ICC switched to remote learning. While the college was remote-only, Van Hester continued performing her responsibilities and more. ICC had a shortage of English tutors, so ICC assigned Van Hester to tutor English, for 10 hours a week, in addition to her other responsibilities, for no additional compensation.

22.     In early May 2021, Van Hester submitted a request to Wright to continue working on a flextime schedule over the summer. Wright responded that Van Hester should send a proposed work schedule for the summer. Among other things, Wright wrote "I realize that these may be virtual hours over the summer." Van Hester responded with a proposed summer work schedule, "subject to cabinet

6

approval." Wright never responded, and ICC's cabinet never reviewed or approved the proposed work schedule. At the time, Van Hester's office was closed to the public due to the pandemic, and all her work was done remotely.

23.     In early June 2021, Van Hester registered for two classes at ICC. One was an online class. The other was an in-person class relating to multimedia. The multimedia class was directly relevant to Van Hester's job responsibilities as Director of International Education. Van Hester was responsible for preparing orientation materials and other resources for incoming and prospective international students. The pandemic, and the move to remote learning, had illustrated the importance of being able to create engaging, concise multimedia presentations. Van Hester intended to use the skills she learned in the class to prepare more relevant, interesting, and dynamic multimedia materials for ICC's international students.

24.     Van Hester accurately filled out the standard tuition waiver paperwork and submitted it to ICC's benefits department. ICC approved her tuition waiver. Beginning in late June, Van Hester began taking the multimedia class. Van Hester had her laptop in class and sent and received many work emails during class. When she had work meetings or other responsibilities that required in person attendance, Van Hester missed class. Van Hester continued performing capably the myriad responsibilities of ICC's Director of International Education during the time she was taking the multimedia class. Among many other things, Van Hester was responsible for communicating with dozens of international students across time

7

zones and worked countless hours outside of the standard business day. Van Hester continued to work late nights and early mornings as needed and often.

25.     While Van Hester was taking the multimedia class, Wright learned that Van Hester was taking the class. Despite being aware that Van Hester was taking the class, Wright did not express concern about Van Hester's decision to take the class. Wright did not accuse Van Hester of engaging in thievery or fraud because Van Hester, a Director-level college administrator, was taking a work-related summer class. Wright did not indicate that Van Hester was required to be chained to her physical desk to work remotely during work hours. Wright did not identify any work responsibilities that Van Hester had been failing to perform. Wright did not order or request that Van Hester stop taking the class. Accordingly, Van Hester continued taking the class and performing her work responsibilities.

26.     Around the same time, in the Spring and Summer of 2021, ICC began the process of reopening its campus after the COVID-19 pandemic. ICC took a laissez-faire approach, declining to require vaccinations or masks for those working or attending classes on campus. Wright held a meeting at which she emphasized that ICC's loose COVID policies were non-negotiable, and that staff and faculty were prohibited from taking further steps to protect themselves. Van Hester, who was expected to interact in person with students from all over the world (very few of whom were vaccinated) pushed back strongly on the lack of protections for staff and students. At a staff meeting, in front of many colleagues, Van Hester respectfully but forcefully challenged Wright regarding the obviously dangerous lack of protections for ICC's in-person faculty and staff.

8

27.    Van Hester completed the multimedia class without incident in late July 2021. The class had not interfered with her work, which she continued to perform well, as she had throughout her tenure at ICC. In particular, during the month of July 2021, Van Hester had collected the relevant documentation from and successfully assisted dozens of international students with the complex process necessary to obtain F-1 visas. This class comprised the largest class of international students in ICC's history, and was a testament to Van Hester's outstanding work for the college.

28.    On Friday, August 6, 2021, Budde, on behalf of ICC, sent to Van Hester a document entitled "Notice of Intent to Terminate." ICC accused Van Hester of engaging in "fraud" and "theft" because she had taken the work-related multimedia class during business hours. The timing of the notice was carefully and obviously orchestrated to railroad Van Hester and prevent her from reasonably contesting the outrageous allegations against her. ICC gave Van Hester zero business days to prepare her "defense." ICC scheduled a "hearing" regarding the accusations of "fraud" and "theft" for the following Monday, August 9. Wright attended and participated in the hearing along with Budde.

29.    The accusations were blatantly discriminatory, retaliatory, and frankly shocking on several levels. First, during the COVID-19 pandemic, ICC permitted certain employees to perform second jobs for their personal benefit during work hours. For example, a white managerial employee took a job with the census bureau to make extra money during ICC work hours. This manager, unlike Van Hester, faced no discipline for her actions. ICC, Budde, and Wright relied on racist

9

stereotypes about Black criminality when accusing Van Hester of "fraud" and "theft" for taking a work-related class, while refusing to take any disciplinary action against non-Black employees who took on second jobs during ICC work hours for their own personal, monetary benefit.

30.     Second, in accusing Van Hester of "fraud" and "theft" for taking a class and therefore not physically being at her desk during the entire business day, ICC and the Individual Defendants treated Van Hester differently than non-Black administrators at ICC. With respect to its non-Black Directors, Deans, and other high-level administrators, ICC treated them as the professionals they were. ICC did not require, on penalty of termination, these high-level administrators to sit at their desks during all work hours while working remotely. ICC trusted the non-Black administrators to perform their duties without being chained to their desks. ICC judged the non-Black administrators based on the work they performed, rather than the location in which they performed it. But ICC imposed a different standard on Van Hester, whom ICC accused of "fraud" and "theft" even though she was performing (and, indeed, going above and beyond) her duties, because she was in class for part of the day.

31.     Third, ICC's purported justification for accusing Van Hester of "theft" and "fraud" did not even make sense on its own terms. ICC accused Van Hester of wrongdoing because she was in class during some of the hours listed on her May email to Wright, described above. But (a) the email was sent in the context of a request to continue working flextime hours; (b) Wright ignored the email with the proposed schedule and no one ever approved it; (c) Van Hester's office was closed to

10

the public and she was working remotely anyway during this time; and (d) Wright's response to Van Hester's initial email specifically said that Van Hester's hours "may be virtual hours over the summer."

32.  Fourth, Wright's actions were completely inconsistent with an honest belief that Van Hester had engaged in "fraud" or "theft" by taking a class during work hours. Wright knew Van Hester was taking the class. She did not tell Van Hester to stop taking the class. She did not accuse Van Hester of thievery or of defrauding the school. Nor did she tell Van Hester that she would face discipline or termination if she performed some of her work during the business day from a classroom.

33.  ICC's actions after the August 9, 2021 "hearing" further demonstrate that ICC's stated reasons for terminating Van Hester were not the real reasons. Despite accusing her of being a thief and a fraudster, ICC did not immediately suspend Van Hester. Instead, ICC allowed her to continue to work on campus, where—if ICC's racist accusations about her criminality were true—Van Hester would have further opportunities to steal from and defraud the college. In reality, ICC knew that Van Hester was a committed and successful administrator who did her job well, with honesty and integrity. ICC knew that the most important weeks of the year in Van Hester's job were in mid-August. During this time period, Van Hester was responsible for the complex and time-consuming process of completing registration for ICC's incoming international students on F-1 visas.

11

34.     ICC waited until August 24, 2021 to fire Van Hester, after she had completed processing registration for ICC's large class of incoming international students on F-1 visas.

35.     As a direct and proximate result of the Defendants' conduct, Van Hester has suffered wage and financial losses and irreparable damage to her career.

36.     As a direct and proximate result of Defendants' conduct, Van Hester has suffered emotional and mental distress, loss of reputation, embarrassment and humiliation, loss of enjoyment of life, inconvenience, and other non-pecuniary losses.

37.     By the acts and conduct described above, Defendants intended to cause Van Hester severe emotional distress, or acted in reckless disregard of the injury that its actions had caused and would cause to Van Hester.

38.     Punitive damages are appropriate because Defendants' conduct was malicious and/or Defendants were recklessly indifferent to Van Hester's protected rights.

39.     Plaintiff timely filed a cross-filed charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and Illinois Department of Human Rights ("IDHR"). Plaintiff has received her notice of right to sue from the EEOC.[1]

---

[1]     Plaintiff's opt-out request with the Illinois Department of Human Rights is still pending. Plaintiff intends to amend her complaint to add claims under the Illinois Human Rights Act when the agency has processed her paperwork.

## COUNT I

### RACE DISCRIMINATION IN VIOLATION OF TITLE VII
### (Against ICC)

40.     Plaintiff realleges Paragraphs 1 through 39 and incorporates them by reference as though fully stated herein as part of Count I of this Complaint.

41.     Title VII of the Civil Rights Act of 1964 makes it unlawful "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race" or "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race." 42 U.S.C. § 2000e-2(a).

42.     By the acts and conduct described above, ICC discriminated against Plaintiff because of her race, Black.

43.     Plaintiff was subjected to and harmed by ICC's discrimination based on her race, Black.

44.     As a direct and proximate result of ICC's conduct, Plaintiff has suffered damages.

## COUNT II
## RETALIATION IN VIOLATION OF TITLE VII
### (Against ICC)

45.     Plaintiff realleges Paragraphs 1 through 39 and incorporates them by reference as though fully stated herein as part of Count II of this Complaint.

46.     Title VII of the Civil Rights Act of 1964 makes it unlawful to retaliate against an employee for opposing discriminatory employment practices. 42 U.S.C. § 2000e-3(a).

47.     Plaintiff engaged in protected activity by repeatedly opposing ICC's discriminatory practices.

48.     ICC took adverse employment action against Plaintiff in retaliation for engaging in this protected activity.

49.     Plaintiff was subjected to and harmed by ICC's retaliation after she opposed its discriminatory conduct.

50.     As a direct and proximate result of Defendants' conduct, Plaintiff has suffered damages.

## COUNT III
## RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1983
### (Against Budde and Wright in their Individual Capacities)

51.     Plaintiff realleges Paragraphs 1 through 39 and incorporates them by reference as though fully stated herein as part of Count III of this Complaint.

52.     The Equal Protection Clause prohibits discrimination on the basis of race, as enforced through 42 U.S.C. Section 1983.

53.     As described above, the Individual Defendants deprived Plaintiff of her right to be free from racial discrimination in her employment with ICC.

54.     The Individual Defendants acted under color of law when depriving Plaintiff of her right to be free from racial discrimination.

55.     By the conduct as alleged in this Complaint, in which Individual Defendants Budde and Wright personally participated, the Individual Defendants violated the Equal Protection Clause and 42 U.S.C. Section 1983.

## COUNT IV
## RETALIATION IN VIOLATION OF 42 U.S.C. § 1983
### (Against Budde and Wright in their Individual Capacities)

56.     Plaintiff realleges Paragraphs 1 through 39 and incorporates them by reference as though fully stated herein as part of Count IV of this Complaint.

57.     Section 1983 prohibits race-based retaliation as well as retaliation for the exercise of First Amendment rights.

58.     Plaintiff engaged in protected activity by opposing ICC's racially discriminatory employment practices. Plaintiff engaged in further protected activity by opposing ICC's reckless and cavalier COVID-19 reopening procedures.

15

59.     As described above, the Individual Defendants retaliated against Plaintiff for engaging in protected activity.

60.     The Individual Defendants acted under color of law when depriving Plaintiff of her right to be free from race-based and speech-based retaliation.

61.     By the conduct as alleged in this Complaint, in which Individual Defendants Budde and Wright personally participated, the Individual Defendants violated the Equal Protection Clause, the First Amendment, and 42 U.S.C. Section 1983.

## COUNT V
### Illinois Civil Rights Act – Race Discrimination
### (Against ICC)

62.     Plaintiff realleges Paragraphs 1 through 39 and incorporates them by reference as though fully stated herein as part of Count V of this Complaint.

63.     ICC is a unit of State government in Illinois.

64.     Through its actions described above, ICC intentionally or unintentionally excluded Plaintiff from participation in and denied her the benefits of employment opportunities on grounds of her race.

65.     Through its actions described above, ICC utilized criteria or methods of administration that had the effect of subjecting Plaintiff to discrimination because of her race.

66.     Plaintiff was damaged by ICC's conduct.

**COUNT VI**
**Illinois Civil Rights Act – Retaliation**
**(Against ICC)**

67.     Plaintiff realleges Paragraphs 1 through 39 and incorporates them by reference as though fully stated herein as part of Count VI of this Complaint.

68.     ICC is a unit of State government in Illinois.

69.     Through the actions described above, ICC retaliated against Plaintiff for opposing its racially discriminatory practices.

70.     Plaintiff was damaged by ICC's conduct.

**COUNT VII**
**Illinois Equal Pay Act**
**(Against ICC)**

71.     Plaintiff realleges Paragraphs 1 through 39 and incorporates them by reference as though fully stated herein as part of Count VII of this Complaint.

72.     The Illinois Equal Pay Act prohibits employers from discriminating against African American employees by paying them less than non-African American employees for substantially similar work. 820 ILCS 112/10.

73.     As described above, ICC paid Van Hester less than similarly situated non-African American employees for substantially similar work, throughout her tenure as ICC's Director of International Education.

74.     This discriminatory pay disparity negatively affected every paycheck Van Hester received during her time working at ICC, up until her termination.

**COUNT VIII**
**Illinois Equal Pay Act - Retaliation**
**(Against ICC)**

75.     Plaintiff realleges Paragraphs 1 through 39 and incorporates them by reference as though fully stated herein as part of Count VIII of this Complaint.

76.     The Illinois Equal Pay Act makes it illegal to retaliate against an employee "because that employee has made a complaint to his or her employer" that "he or she or any employee of the employer has not been paid in accordance with" the Illinois Equal Pay Act. 820 ILCS 112/35.

77.     As described above, Van Hester repeatedly complained to ICC that she was paid less than similarly situated non-African American employees.

78.     Through the actions described above, ICC retaliated against Plaintiff for opposing its racially discriminatory practices.

79.     Plaintiff was damaged by ICC's conduct.

**COUNT IX**
**Retaliatory Discharge (Illinois Common Law)**
**(Against ICC)**

80.     Plaintiff realleges Paragraphs 1 through 39 and incorporates them by reference as though fully stated herein as part of Count IX of this Complaint.

81.     Plaintiff was an at-will employee.

82.     ICC terminated Plaintiff's at-will employment.

83.     ICC terminated Plaintiff's employment in retaliation for opposing ICC's reckless and cavalier COVID-19 reopening procedures.

84.     ICC's reckless and cavalier COVID-19 reopening procedures violated clear mandates of Illinois public policy.

18

85. As a direct and proximate result of Defendants' actions, Plaintiff suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court find in her favor and against Defendants as follows:

a. Declare that the acts and conduct of Defendants are unlawful and violate Title VII, 42 U.S.C. § 1983, the Illinois Civil Rights Act, the Illinois Equal Pay Act and Illinois common law;

b. Award Plaintiff the value of all compensation and benefits lost as a result of Defendants' unlawful conduct;

c. Award Plaintiff the value of all compensation and benefits she will lose in the future as a result of Defendants' unlawful conduct;

d. Award Plaintiff compensatory damages, including but not limited to damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of reputation, and other non-pecuniary losses;

e. Award Plaintiff punitive damages due to Defendants' malicious conduct and/or Defendants' reckless or callous indifference to the statutorily protected rights of Plaintiff;

f. Award Plaintiff prejudgment interest;

g. Award Plaintiff attorneys' fees, costs, and disbursements; and

h. Award Plaintiff such other make whole equitable, injunctive, and legal relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues of fact and damages triable in this action.

Respectfully submitted,


/s/ *Matthew J. Singer*_____


Dated: December 22, 2021

Matthew J. Singer
MATT SINGER LAW, LLC
77 W. Wacker Dr., Suite 4500
Chicago, Illinois 60601
Phone: (312) 248-9123
Matt@MattSingerLaw.com